**TAULER SMITH LLP**
Robert Tauler (SBN 241964)
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (310) 590-3927
rtauler@taulersmith.com

**KJC LAW GROUP, A.P.C.**
Kevin J. Cole (SBN 321555)
9701 Wilshire Blvd., Suite 1000
Beverly Hills, CA 90212
Tel: (310) 861-7797
kevin@kjclawgroup.com

*Attorneys for Plaintiff*
*Jessica Argueta*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA ARGUETA, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1. **BREACH OF EXPRESS WARRANTY;** |
| WALGREENS COMPANY; and DOES 1 to 10, inclusive, | 2. **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY; and** |
| Defendant. | 3. **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, *et seq.*** |
| | **[DEMAND FOR JURY TRIAL]** |

COMPLAINT

Plaintiff Jessica Argueta ("Plaintiff"), individually and on behalf of all others similarly situated, brings this suit against the Defendant Walgreens Company ("Defendant" or "Walgreens"), and complains and alleges the following based on personal knowledge as to herself, the investigation of counsel, and on information and belief as to all other matters. Plaintiff believes that substantial evidence will support the allegations set forth in this complaint, after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      Millions of Americans trust their corner pharmacy to sell them safe, effective, and lawful remedies for their illnesses. In this regard, pharmacies are the primary point of purchase for over-the-counter ("OTC") drugs and the primary source of information for OTC medications.[1] Reliance on OTC medications is heightened in underserved communities who are more vulnerable due to their lack of access to medical care and significantly lower education levels. At the same time, the last two decades have seen commoditization of OTC drugs by mercenary interests seeking to exploit the $37 billion OTC drug market through any means necessary.[2]

2.      Given the enormous economic incentives provided by the OTC drug market and the outsized trust bestowed on pharmacies by underserved communities, the opportunity to abuse consumers' trust is manifest. This is particularly so where, as here, the drug at issue, Phenazopyradine Hydrochloride ("PhenAzo"), costs as little as ten cents to make, but can be sold for as much as three to four times that amount per unit, if not more.

3.      This case is about Defendant's sale of PhenAzo to treat symptoms of a Urinary Tract Infection ("UTI"), a medical condition that disproportionately impacts

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5386627/

[2] https://www.precedenceresearch.com/over-the-counter-drugs-market#:~:text=The%20North%20America%20over%20the,30%25%20market%20share%20in%202021.

women, and in particular women in underserved communities.  Defendant sells PhenAzo to treat UTI infections even though it is unsafe, ineffective, and **unlawful to sell.**

4.    Defendant sells PhenAzo over-the-counter, marketed as a finished drug products called "Urinary Pain Relief" (the "Product" or "Products"), as seen here:



*See*  https://www.walgreens.com/store/c/walgreens-urinary-pain-relief-tablets/ID=prod6207450-product.



*See* https://www.walgreens.com/store/c/walgreens-maximum-strength-urinary-pain-relief-tablets/ID=prod6028643-product?skuId=400625195.

## THE PARTIES

5.      Plaintiff Jessica Argueta is and at all relevant times mentioned was a resident of Kern County, California.

6.      Defendant Walgreen Co., is, and at all times mentioned in this Complaint was, a publicly traded corporation with headquarters at 200 Wilmot Road in Deerfield, Illinois 60015. Defendant can sue and be sued in this Court.

7.      Plaintiff does not know the true names or capacities of the persons or entities sued as DOES 1 to 10, inclusive, and therefore sues such Defendants by such fictitious names.  Plaintiff is informed and believes, and upon such information and belief alleges, that each of the DOE Defendants is in some manner legally responsible for the damages

suffered by Plaintiff and the Class members as alleged in this Complaint. Defendants shall together be referred to as "Defendant" or "Walgreens."

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

9.    The Eastern District of California has specific personal jurisdiction over Walgreens. Specific jurisdiction over a non-resident defendant exists where: (1) "[t]he non-resident defendant . . . purposefully direct[s] [it]s activities or consummate[s] some transaction with the forum or resident thereof; or perform[s] some act by which [it] purposefully avails [it]self of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;" (2) the claim is one that "arises out of or relates to" the defendant's activities in the forum state; and (3) the exercise of jurisdiction comports with "fair play and substantial justice, i.e. it must be reasonable." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The plaintiff need only establish the first two prongs, while it is the defendant's burden to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Id.*

10.    ***Purposeful Availment.*** Under the first prong of the three-part test, "purposeful availment" includes both purposeful availment and purposeful direction, which are two distinct concepts. *Id.* Where a case sounds in tort, as here, courts employ the purposeful direction test. Purposeful direction requires the defendant have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017) (citing *Schwarzenegger*, 374 F.3d at 802).

11.    On information and belief, Walgreens regularly sells its Products to consumers in California, including Plaintiff, who purchased and received the Products in

Kern County, California. In addition, because Walgreens does a substantial amount of business in California, it is knowingly selling an illegal drug directed at and harming California residents, including Plaintiff.

12.     ***Claim Arising Out of Action in the Forum Prong.*** Under the second prong of the three-part specific jurisdiction test, personal jurisdiction exists where, as here, the claim "arises out of or relates to" the defendant's activities in the forum state. Courts in the Ninth Circuit use a "but for" test to determine whether the claim "arises out of" the nonresident's forum-related activities. In other words, the test is satisfied if the plaintiff would not have suffered loss "but for" defendant's activities. *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). Here, Walgreens's contact with the forum—knowingly selling an illegal drug directed at California residents—is the basis of its violations of law. But for Walgreens's contact with the forum, Plaintiff (and the thousands of other individuals who purchased Walgreens's Products) would not have suffered harm.

13.     ***Venue.*** Venue is proper in the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 1391 because Walgreens:

a)     is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District;

b)     does substantial business within this District;

c)     is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and the injury to Plaintiff occurred within this District.

## HISTORY OF PHENAZO

14.     PhenAzo's analgesic properties were discovered in 1932 by Bernhard Joos, the founder of Cilag (a pharmaceutical company). Joos later branded his discovery as Pyridazil, a drug marketed to relive urinary pain.

15.      PhenAzo is a urinary analgesic used for the relief of urinary pain, burning, and discomfort associated with urinary tract infections or other urinary conditions. It is not

an antibiotic and will not cure the infection itself. (*See* https://www.mayoclinic.org/drugs-supplements/phenazopyridine-oral-route/side-effects/drg-20065473?p=1.)

## HOW PHENAZO CAME TO BE SOLD UNLAWFULLY

16.    The Food and Drug Administration ("FDA"), under the Federal Food, Drug, and Cosmetic Act ("FFDCA"), regulates the safety and effectiveness of prescription and nonprescription ("over-the-counter, or OTC") drugs sold in the United States.[3] The use of PhenAzo pre-dates the existence of the FDA.

17.    The FFDCA, established in 1938 and subsequently amended multiple times, initially required drug manufacturers to submit a New Drug Application ("NDA") before marketing a new drug to demonstrate its safety. (P.L. 75-717 (Prior to the 1938 law, drugs were marketed in the United States without FDA review).)

18.    In 1962, the Kefauver-Harris Drug Amendments expanded this requirement to include substantial evidence of effectiveness in addition to safety. (P.L. 87-781.) This set the foundation for the modern drug approval process.

19.    For drugs introduced between 1938 and 1962, which were considered safe but of unknown effectiveness, the FDA initiated the Drug Efficacy Study Implementation ("DESI") in 1966. (31 Fed. Reg. 9426 (July 6, 1966).) This effort aimed to evaluate the effectiveness of prescription drugs, initially, and later, OTC drugs. Holders of NDAs approved between 1938 and 1962 were required to submit data and information supporting the effectiveness of drugs approved during that time to the FDA for evaluation. (31 Fed. Reg. 9426 (July 6, 1966).)

20.    The FDA's final DESI determination categorized drugs as either effective for their labeled indications or lacking substantial evidence of effectiveness. If a drug was

---

[3] Prescription drugs require health practitioner supervision to ensure their safe usage, as they can pose risks due to toxicity, potential adverse effects, or their method of administration. FFDCA §503(b)(1) [21 U.S.C. §355(b)(1)]. On the other hand, OTC drugs do not require a prescriber's authorization and can be used by consumers as long as they have a substantial safety margin, a low likelihood of misuse or abuse, and are appropriately labeled to enable consumers to self-diagnose their condition, choose the medication, and manage their condition independently. FDA, "Regulatory Approaches for Prescription to OTC Switch," July 2, 2015, https://www.fda.gov/media/93193/download.

classified as effective, it could be marketed with FDA approval for safety and effectiveness, either through a New Drug Application ("NDA") or an Abbreviated New Drug Application ("ANDA") for related products (generic drugs). Once approved, the drug no longer fell under DESI regulation. However, if a drug was deemed lacking substantial evidence of effectiveness, a hearing opportunity ("DESI proceeding") was provided. If no hearing was requested or if it was denied, the FDA withdrew approval, leading to enforcement actions against the drug and similar products, rendering them unmarketable as unapproved new drugs. The final decisions of DESI proceedings were issued as "DESI notices."

21.    On July 29, 1983, the FDA published a DESI notice in the Federal Register (48 Fed. Reg. 34516). This notice outlined the conditions for approval and marketing of old drugs including phenazopyridine-containing drug products, whether they were single entities or fixed combinations.

22.    Importantly, this notice did not comment on the safety and efficacy of any OTC single entity phenazopyridine products. Instead, the DESI notice specifically highlighted certain labeling statements (a carcinogenicity statement) that were required for phenazopyridine-containing drug products intended for relieving symptoms associated with urinary tract infections. Additionally, the notice also outlined specific labeling requirements (a determined length of dosing) applicable to all phenazopyridine-containing drug products. (48 Fed. Reg. 34516 (July 29, 1983).)

23.    DESI review soon proved to be burdensome for OTC drugs due to the vast number of OTC drug products on the market at the time (potentially up to 500,000) and the discrepancy of OTC drugs' FDA approval status, some OTC drugs had been approved under an NDA based on safety but not effectiveness, while others had never been approved at all. (37 Fed. Reg. 85 (January 5, 1972).)

24.    The posed challenges of product-by-product review of OTC drugs lead to the proposal of the OTC Drug Review in 1972. (37 Fed. Reg. 9464 (May 11, 1972).) This process allowed the lawful marketing of certain OTC drugs (OTC drugs based on active

ingredient(s) vs. OTC drugs as a finished drug product) pursuant to a GRASE (or "generally recognized as safe and effective") determination within their respective therapeutic drug category (e.g., antacids). OTC drug monographs were established, revised, and amended through the rulemaking process. Before a final monograph was established, tentative final monographs outlined generally recognized as safe and effective (GRASE) conditions for specific therapeutic categories through proposed rules. The final OTC drug monographs were codified in regulations under Title 21 of the CFR (Code of Federal Regulations).

25.     In 2003, the FDA requested data on the safety and efficacy of all OTC urinary antiseptics/analgesics that are eligible for original OTC drug review but have not been reviewed by the FDA to date—phenazopyridine fell into this category. (68 Fed. Reg. 75585 (Dec. 31, 2003).)

26.     In this notice, the FDA states that "none of the single-entity [PhenAzo] drugs marketed . . . have been the subject of an approved [NDA]." (*Id*.) In reviewing phenazopyridine's dual-marketing status—as a prescription when tablets contained 200 mg and as an OTC when tablets contained 190 or 195 mg or less—the FDA allowed phenazopyridine to retain its dual marketing status (determined by the mg level) on the basis of its marketing history alone. (*Id*.) All submissions in response to the FDA's request for data regarding phenazopyridine OTC drug products did not report newly conducted clinical studies, as is required by the FDA to establish safety and efficacy.

27.     In 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") replaced the OTC drug monograph rulemaking process with a new administrative order process.

28.     The CARES Act changed the framework for regulating OTC monograph drugs with the addition of section 505G to the FFDCA. At the time the CARES Act was enacted, some OTC monographs were still in the proposed rulemaking stage, either entirely or partially. According to section 505G(b)(8) of the FFDCA, a final monograph or tentative final monograph that establishes conditions of use for a drug described in section

505G(a)(1) or (2) of the FFDCA and represents the most recent version of the conditions, including any modifications by proposed or final rules, is considered a final order.

## CURRENT OTC DRUGS REGULATIONS

29.    Prior to entering the U.S. market, OTC drugs must be approved by the FDA to ensure they are either (a) known to be safe and effective for their intended use as a finished drug product or (b) as an active ingredient are generally recognized as safe and effective (GRASE) for their intended use within a therapeutic drug category. FDA approval serves as an assurance to consumers that the OTC drug's effects have been reviewed by the FDA's Center for Drug Evaluation and Research (CDER), and that its benefits outweigh known and potential risks for the intended population. (See https://www.fda.gov/drugs/development-approval-process-drugs.)

30.    There are two regulatory pathways to bring an OTC drug into the U.S. market. (*See* https://www.fda.gov/drugs/otc-drug-review-process-otc-drug-monographs.) A manufacturer can either (1) submit an NDA or ANDA for approval to FDA or (2) use the OTC drug monograph process. (FFDCA §505 [21 U.S.C. §355].)

31.    Both the NDA or ANDA and monograph pathways involve a scientific decision by FDA; however, the two mechanisms are different. A primary difference is that approval of an NDA or ANDA results in the approval to sell a specific *finished drug product*, whereas the OTC drug monograph process focuses on the safety and effectiveness of one or more *active ingredients* within a drug category.[4]

32.    The first pathway is through the drug application process (NDA or ANDA), which involves submitting an FDA drug application for a specific finished drug product. This process requires a manufacturer to submit clinical trial data demonstrating safety and effectiveness of an individual OTC drug product and FDA approval prior to marketing.

---

[4] FDA, "The ABCs of OTCs: Little-Known Facts About Over-the-Counter Drugs," presentation by Karen Murry Mahoney, MD, FACE, Deputy Director of the Division of Nonprescription Drug Products, Center for Drug Evaluation and Research, FDA, p. 29, https://www.fda.gov/media/97292/download.

Once the application is approved as either an NDA or ANDA, the drug is deemed to be known safe and effective and can be marketed as an OTC drug.

33.    The second pathway is through the OTC Drug Review (or "OTC drug monograph") process. *Id*. An OTC drug monograph is a "rule book" that defines specific conditions, such as active ingredients, uses (indications), doses, routes of administration, labeling, and testing, under which an OTC drug in a given therapeutic category (e.g., sunscreen, antacid) is generally recognized as safe and effective (GRASE) for its intended use. This approach introduces the nonprescription drug to the market under an OTC drug monograph without the need for an FDA-approved NDA or ANDA application.

34.    By following the "rule book" of the OTC drug monograph (i.e., the OTC drug product adheres to the conditions outlined in the OTC drug monograph), the OTC drug is deemed to be generally recognized safe and effective ("GRASE") for its intended use in its given therapeutic category and does not require individual FDA approval as a specific finished drug product prior to entering the market. Compliance with the regulations and requirements outlined in established OTC drug monographs is assessed by the FDA during the inspection process to ensure GRASE standards are met before a finished drug product can be marketed.

35.    In summary, both pathways allow for legal marketing of OTC drugs in the U.S. The first option requires an FDA-approved drug application for a specific finished drug product, while the second option relies on adherence to an established OTC drug monograph approved by the FDA for a generally recognized safe and effective (GRASE) intended use of one or more active ingredients within a therapeutic category.

36.    To date, PhenAzo (the Products) has never been approved by the FDA or brought to market under an established OTC drug monograph.

## PLAINTIFF'S PURCHASE

37.    On or about August 17, 2023, Plaintiff purchased the Product from Walgreens for use in treating a urinary tract infection.

38.    A reasonable consumer understands there are procedures, policies, and regulations in place for bringing drugs to market—i.e., a reasonable consumer understands that there is some sort of approval process that drugs must be subjected to before they can be legally sold to consumers.

39.    A reasonable consumer also understands that if Walgreens—a trusted local pharmacy—is selling a drug, marketed as a finished product, that such drug is approved for lawful sale.

40.    Plaintiff is a reasonable consumer who understood and believed that Walgreens could lawfully sell the Products.

## CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action on behalf of herself and all persons similarly situated pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following class:

> All persons in the United States who purchased the Products from Walgreens within the four years prior to the filing of this Complaint.

42.    The above-described class of persons shall hereafter be referred to as the "Class." Excluded from the Class are any and all past or present officers, directors, or employees of Walgreens, any judge who presides over this action, and any partner or employee of Class Counsel. Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

43.    In the alternative, Plaintiff seeks certification of the following class pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure:

> All persons in the State of California who purchased the Products from Walgreens within the four years prior to the filing of this Complaint.

44.    The above-described class of persons shall hereafter be referred to as the "California Class." Excluded from the California Class are any and all past or present

officers, directors, or employees of Walgreens, any judge who presides over this action, and any partner or employee of Class Counsel. Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

45.    **Numerosity**.  The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, but on information and belief, Plaintiff alleges that there are thousands of members of the Class, if not more.

46.    **Typicality**.  Plaintiff's claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Walgreens's course of conduct as described in this Complaint. Identical to all members of the Class, Defendant sold a drug that it was not authorized to sell. Plaintiff is advancing the same claims and legal theories on behalf of herself and all absent members of the Class. Walgreens has no defenses unique to the Plaintiff.

47.    **Adequacy of Representation**.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class. Plaintiff has retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiff and her counsel intend to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Class.

48.    **Existence and Predominance of Common Questions of Law or Fact**. Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

a)    Whether Defendant breached the express warranty that it was lawful to sell the Products?

b)    Whether Defendant breached the implied warranty of merchantability by selling the unlawful Products?

c)    Whether Defendant's sale of the Products violates the unlawful, unfair, and fraudulent prongs of the UCL?

d)    To what extent did Defendant's conduct cause, and continue to cause, harm to the Class?

e)    Whether the members of the Class are entitled to damages and/or restitution.

f)    What type of injunctive relief is appropriate and necessary to enjoin Defendant from continuing to unlawfully sell the Products?

49.   **Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

50.   By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or

COMPLAINT

that would substantially impair or impede the ability of such non-party Class members to protect their interests.

51.    **Ascertainability**. Upon information and belief, Walgreens keeps extensive computerized records of its sales and customers through, among other things, databases storing customer orders, customer order histories, customer profiles, customer loyalty programs, and general marketing programs. Walgreens has one or more databases through which a significant majority of members of the Class may be identified and ascertained, and it maintains contact information, including email addresses and home addresses (such as billing, mailing, and shipping addresses), through which notice of this action is capable of being disseminated in accordance with due process requirements.

52.    The California Class also satisfies each of the class action requirements set forth above. The allegations set forth above with regards to the Class, therefore, apply equally to the California Class.

## FIRST CLAIM FOR RELIEF
## (Breach of Express Warranty)

53.    Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

54.    Defendant's very sale of the Products is an express warranty that the Products are lawful to sell.

55.    The affirmations of fact and promises made by Defendant to Plaintiff and the Class regarding the Products became part of the basis of the bargain between Defendant and Plaintiff and the Class, thereby creating an express warranty that the Product would conform to those affirmations of fact, representations, promises, and descriptions—i.e., that the Products were legal to sell.

56.    The Products are not, in fact, legal to sell as the Products are not FDA approved and they are not marketed under an established OTC drug monograph.

57.    Plaintiff and members of the Class suffered economic injury as a direct and proximate result of Defendant's breach of warranty because they would not have purchased the Product on the same terms if they had known that the Product was illegal to sell.

58.    As a result, Plaintiffs and members of the Class have been damaged either in the full amount of the purchase price of the Products or in the difference in value between the Products as warranted and the Products as sold.

## SECOND CLAIM FOR RELIEF

### (Breach of Implied Warranty of Merchantability)

59.    Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

60.    Walgreens is and was at all relevant times a "merchant" within the meaning of the Uniform Commercial Code ("UCC"). Walgreens sold and marketed the Product, which is a "good" within the meaning of the UCC. Consequently, Walgreens impliedly warranted that the Product was merchantable, including that the Products were finished drugs Products that were legal to sell. However, this implied warranty was false with respect to the goods of the kind sold to Plaintiff and Class members.

61.    Under U.C.C. § 2-314(2), in order for goods to be merchantable, they must at least conform to the promise or affirmations of fact made on the container or label. Inherent in the Products' containers or labels is the representation that the Products are drugs capable of being lawfully sold.

62.    However, the Products are not, in fact, legal to sell as the Products are not FDA approved and they are not marketed under an established OTC drug monograph.

63.    In reliance upon Defendant's skill and judgment and the implied warranties above, Plaintiff and Class members purchased the Products.

64.    The Products were not altered by Plaintiff or Class members in a manner that would render the Products lawful to sell.

65.    Defendant knew the Products would be purchased and used by Plaintiff and members of the Class and that the Products are not FDA approved and they are not marketed under an established OTC drug monograph.

66.    Defendant breached its implied warranty of merchantability to Plaintiff and the Class because the Product was not legal to sell.

67.    Plaintiff and members of the Class suffered economic injury as a direct and proximate result of Defendant's breach of warranty because they would not have purchased the Product on the same terms if they had known that the Product was illegal to sell.

68.    As a result, Plaintiffs and members of the Class have been damaged either in the full amount of the purchase price of the Products or in the difference in value between the Products as warranted and the Products as sold.

### THIRD CLAIM FOR RELIEF

### (Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

69.    Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

70.    California Business and Professions Code §§ 17200 *et seq*., also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" as well as "unfair, deceptive, untrue or misleading advertising. *See* Cal. Bus. & Prof. Code § 17200.

71.    The UCL is written in "sweeping language" to include "anything that can properly be called a business practice and that at the same time is forbidden by law." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264 (1992) (internal brackets and quotation marks omitted).

72.    The UCL imposes strict liability. That is, Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

73.    A business act or practice is "fraudulent" within the meaning of the UCL if members of the public are likely to be deceived. Here, members of the public (reasonable consumers) are likely to be deceived by Defendant's conduct in selling the Products as lawful, finished-drug products, when the Products are, in fact, unlawful to sell. As a result, Plaintiff's claims are fraudulent within the meaning of the UCL.

74.    The UCL also prohibits "unfair" business practices.  A business practice can be "unfair"—and violative of Section 17200—even if it is not "deceptive" and even if it is "lawful."  *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999). Defendant's business practice of selling the Products as lawful, finished-drug products, when the Products are, in fact, unlawful to sell is immoral, unethical, oppressive, unscrupulous, and therefore substantially injurious to consumers who purchase the Products. Defendant's having realized profits from the sale of the Products is "unfair" within the meaning of the UCL.

75.    The UCL also permits a cause of action to be brought if a practice violates some other law. In effect, the "unlawful" prong of Section 17200 makes a violation of the underlying law a *per se* violation of Section 17200. *See Kasky v. Nike, Inc.*, 27 Cal.4th 939, 950 (2002) (upholding false advertising claims against Nike; the Supreme Court explained that the "unlawful" prong of Section 17200 makes a violation of the underlying law a *per se* violation of the UCL; the court held, "The UCL's scope is broad. By defining unfair competition to include any '*unlawful* . . . business act or practice,' the UCL permits violations of other laws to be treated as unfair competition that is independently actionable.") (emphasis in original); *see also Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553, 561 (1998), *overruled on other grounds in Arias v. Superior Court*, 46 Cal.4th 969 (2009) (holding that § 17200 allows a remedy even if the underlying statute confers no private right of action).

76.    California law is clear that virtually any law or regulation—here, the laws and regulations surrounding the drug approval process—can serve as a predicate for a Section 17200 "unlawful" violation.

77.     Thus, because the Products are not lawful to sell, Walgreens has violated the "unlawful" prong of Section 17200.

78.     Plaintiff and each member of the Class suffered an injury in fact and lost money or property as a result of Defendant's unlawful, unfair, and/or fraudulent business practices.

79.     Plaintiff, on behalf of herself and the members of the Class, seeks restitution as well as disgorgement of all moneys received by Defendant through the conduct described above.

80.     Plaintiff, on behalf of herself and the members of the Class, seeks a temporary, preliminary, and/or permanent injunction from this Court prohibiting Defendant from engaging in the patterns and practices described herein, including but not limited to, putting a stop to the unlawful sale of the Products.

81.     Injunctive relief is necessary to prevent future harm to consumers, including Plaintiff. Every day, consumers like Plaintiff are misled into believing they are purchasing a finished-drug product that has been approved for lawful sale. Without injunctive relief, Defendant will continue to mislead consumers, and consumers will continue to purchase the unlawful Products.

## **PRAYER**

WHEREFORE, Plaintiff prays for relief and judgment in favor of herself and the Class as follows:

1.     For an order certifying that the action be maintained as a class action, that Plaintiff be designated the class representative, and that undersigned counsel be designated as class counsel.

2.     For an injunction putting a stop to the illegal conduct described in this Complaint and ordering Defendant to correct its illegal conduct and refrain from selling the unlawful Products.

3.     For an order awarding Plaintiff and the proposed Class members actual, consequential, restitution, punitive, and statutory damages, as appropriate.

4.    For an award of restitution and disgorgement of moneys paid that Defendant obtained as a result of its unfair, deceptive, untrue, and misleading business practices, all as described above.

5.    For pre- and post-judgment interest and costs of suit incurred.

6.    For reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorneys' fees

7.    Plaintiff be awarded such other and further relief as the Court deems just and proper.


Respectfully submitted,


DATED: January 17, 2024            TAULER SMITH LLP


By:    */s/ Robert Tauler*
       Robert Tauler, Esq.
       *Attorney for Plaintiff*
       *Jessica Argueta*

DATED: January 17, 2024            KJC LAW GROUP, A.P.C.


By:    */s/ Kevin J. Cole*
       Kevin J. Cole, Esq.
       *Attorney for Plaintiff*
       *Jessica Argueta*

## JURY DEMAND

Plaintiff Jessica Argueta hereby demands a jury trial for its claims against Defendant.

DATED: January 17, 2024                    TAULER SMITH LLP


                                    By:    */s/ Robert Tauler*
                                           Robert Tauler, Esq.
                                           *Attorney for Plaintiff*
                                           *Jessica Argueta*

DATED: January 17, 2024                    KJC LAW GROUP, A.P.C.


                                    By:    */s/ Kevin J. Cole*
                                           Kevin J. Cole, Esq.
                                           *Attorney for Plaintiff*
                                           *Jessica Argueta*

COMPLAINT